**INTERFIRST BANK–HOUSTON, N.A.,**
**Guardian of the Estate of Ugo**
**DiPortanova, N.C.M., et al., Appellants,**

v.

**QUINTANA PETROLEUM**
**CORPORATION, et al.,**
**Appellees.**

**No. 01–84–0626–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

July 11, 1985.
Rehearing Denied Oct. 10, 1985.

Michael S. Wilk, Joseph S. Cohen, Hirsch & Westheimer, P.C., Houston, for Republic-Bank Houston, Nat. Ass'n, Trustee.

W. Bryant Russell, James Wyckoff, James David Pittman, Sandra L. Perkins, Wyckoff, Russell, Frazier & Centiempo, Houston, for Interfirst Bank Houston, N.A., Guardian of the Estate of Ugo di Portanova, N.C.M.

Paul E. Harris, Childs, Fortenbach, Beck & Guyton, Berry D. Bowen, Andrews & Kurth, Houston, for Tex. American Bank-Houston.

Joe M. Kirkham, Kirkham & Roberts, Houston, Stephen M. Sacks, Peter T. Grossi, Jr., David S. Steuer, Arnold & Porter, Washington, D.C., for Enrico di Portanova & Gregory Hovas, Trustee.

William E. Matthews, Harvey G. Brown, Jr., Sewell & Riggs, Houston, for Gregory Hovas, Co-Trustee of the Estate & La. Trusts for the benefit of Ugo DiPortanova.

J. Eugene Clements, James L. Cornell, Porter & Clements, Houston, for John Neale & H.R. "Babe" Schwartz.

Joseph D. Jamail, Jamail & Kolius, Houston (Stanley M. Johanson, Austin, of counsel), Ewing Werlein, Jr., John L. Carter, D. Gibson Walton, C. Boone Schwartzel, Allan Van Fleet, J. Thomas Scott, Elaine Drodge Koch, Vinson & Elkins, Houston, for Quintana Petroleum Co.; Isaac Arnold, Jr. & Roy H. Cullen, Individually & as Indepen-

dent Executors of the Estate of Agnes Cullen Arnold, Deceased; Margaret Cullen Marshall & Wilhelmina Cullen Robertson, Individually & as two of those who served as Co-Executrices of the Estate of H.R. Cullen & Lillie C. Cullen, Deceased, Harry H. Cullen, Douglas B. Marshall, Sr. and Corbin J. Robertson, Sr.

Before WARREN and JACK SMITH, JJ., and TOM F. COLEMAN, Retired Justice.

## OPINION

TOM F. COLEMAN, Retired Justice.

This is an appeal from a summary judgment. Enrico diPortanova, InterFirst Bank-Houston, N.A., guardian of the estate of Ugo diPortanova, N.C.M., and the trustees of various testamentary trusts set up by the wills of H.R. Cullen and Lillie C. Cullen, his wife, have sued to set aside the transfer of certain shares of stock from the testators' estates to certain family members other than the diPortanovas, and for damages. The principal contention of the plaintiffs is that the executrices of the Cullen estates, all daughters of Mr. and Mrs. Cullen, violated section 352 of the Texas Probate Code when they sold the shares of Quintana Petroleum Corporation stock owned by their parents to their husbands and nephews. The defendants have urged that the self-dealing on the part of the executrices was authorized by the wills of Mr. and Mrs. Cullen, does not violate section 352 of the Texas Probate Code, and that the causes of action are barred by the statute of limitations.

After extensive discovery, the trial court granted a summary judgment. One of the principal bases for the court's action was its finding that as a matter of law the causes of action asserted by the various plaintiffs were barred by the statute of limitations. We find this action on the part of the trial court was correct, and we affirm the judgment.

Prior to 1939, the Cullen oil and gas properties were owned and operated by Quintana Petroleum Company. This corporation had issued 500 shares of common stock, 200 of which Mr. Cullen owned individually, and another 250 of which he controlled as trustee of a trust for the benefit of his children. Roy G. Cullen, his son, owned the other 50 shares.

In 1932, Mr. Cullen discovered the Tom O'Connor Oil Field, which continues to produce today and has been the foundation of the Cullen fortune. Mr. and Mrs. Cullen had five children: a son, Roy G., and four daughters, Lillie, Agnes, Margaret and Wilhelmina. Roy G. worked with his father until 1936, when he died in a drilling accident, leaving a wife, a daughter, and two sons, Roy H. Cullen and Harry H. Cullen.

Agnes had married Isaac Arnold, Sr., Mr. Cullen's chief engineer, who continued to work with the Cullen enterprises for the rest of his life. Margaret and Wilhelmina married men who also worked for Mr. Cullen and continued to work with the Cullen enterprises.

The Cullen's oldest daughter, Lillie, moved to Los Angeles and married Paolo diPortanova. Paolo diPortanova worked for Mr. Cullen for a time but then quit and returned to Los Angeles. Two children, Enrico and Ugo, were born to that marriage. Paolo divorced Lillie in 1937, but neither Lillie nor her sons thereafter lived in Texas during the lifetime of Mr. and Mrs. Cullen.

On December 31, 1938, Mr. Cullen dissolved Quintana Petroleum Company and distributed its assets. At the same time, he formed Quintana Petroleum Corporation to operate his properties. Quintana Petroleum Corporation does not invest in oil and gas properties, but rather operates such properties and provides accounting, tax advice, and other services to the Cullen family and others for a fee.

The initial shareholders of Quintana Petroleum Corporation were Mr. Cullen, Isaac Arnold, Sr., Mr. Cullen's lawyer Harry Holmes, and Harry's brother, John Holmes. In 1943, Mr. Cullen increased the number of shareholders by transferring some of his stock to Mrs. Cullen, Margaret, Wilhelmi-

na, and six non-family corporation employees. He did not give any stock to his daughter Agnes, whose husband, Isaac Arnold, Sr., was among the initial stockholders, nor did he give any stock to Lillie or Paolo diPortanova. The diPortanovas were never active in the business of Quintana Petroleum Corporation, and no stock was ever issued to any of them. After this stock was issued, the shareholders signed an agreement, reciting as its purpose, to "guard against the introduction, as stockholders in said Quintana Petroleum Corporation, of strangers or outsiders in said business." The agreement provided that if any stockholder (1) desired to sell his or her Quintana Petroleum Corporation stock and retire from the business, or (2) for whatever reason, no longer was an active worker in the business, or (3) died, then the remaining stockholders "shall have the option to purchase and acquire the whole of the stock interest of such parties so dying at the book value thereof, which value shall be ascertained by the board of directors by majority vote...."

In 1945, Margaret married Douglas B. Marshall, and Wilhelmina married Corbin J. Robertson. Mr. Marshall and Mr. Robertson went to work for the Quintana Petroleum Corporation, and in 1946, Mr. Cullen made them stockholders of the corporation and had them execute an acknowledgment of the stockholders' agreement. In 1950, Roy H. Cullen, Roy G. Cullen's oldest son, began working with his grandfather at Quintana, and in 1951, he received shares of the corporation stock and signed an acknowledgment of the stockholders' agreement.

In 1953, Mr. and Mrs. Cullen executed their last wills. Mr. Cullen's will, after a few specific bequests, divided the rest of his estate into four equal shares, each share allocated to an "estate trust" for the benefit of each of the children of his four daughters. Mr. Cullen's will did not mention his Quintana stock, but it did provide that the distributions to the trusts were subject to any liability or indebtedness of the estate and subject to all instruments evincing such.

Mrs. Cullen's will was the same as Mr. Cullen's, except that she specifically bequeathed her one share of Quintana stock to him if he survived her. This was permitted by the stockholders' agreement.

Mr. Cullen died on July 4, 1957. His will was probated in Harris County, with Mrs. Cullen serving as executrix. Mrs. Cullen died November 15, 1959, and her will was probated in Harris County, Texas. The executrices of Mrs. Cullen's estate and trustees of the trusts created by her will were the Cullens' daughters, Agnes, Margaret, and Wilhelmina. These daughters also succeeded Mrs. Cullen as executrices and trustees under Mr. Cullen's will.

Since the primary issue in this case relates to the question of whether the executrices acted correctly under the terms of the will and the laws of this state when they sold 127 shares of the stock of Quintana Petroleum Corporation to their husbands and their two nephews, certain provisions common to both wills must be noticed. Each executrix was given, in addition to all of the powers of independent executors under the laws of the State of Texas, all the powers given to the trustees under the will. Prior to final disposition of the estate, partial distributions at the discretion of the executrices were authorized, and it was specifically recognized that the executrixship and the trust created in the will could exist contemporaneously until the executrixship should end.

There is a provision that no executrix shall be responsible or liable for any loss or depreciation in value of the assets of the estate, unless such loss was due to such executrix's gross neglect, bad faith, or fraud.

All of the property belonging to Mr. Cullen (or in the case of Mrs. Cullen's will, Mrs. Cullen), with the exception of household goods, automobiles, furniture, china, jewelry, and certain other things of that character, were devised to the various trusts.

In addition to the rights, privileges, and powers conferred by law at the time of

death or thereafter, the trustees of the trust were granted certain specific rights, privileges, and powers, including the following:

a) To manage and control the trust estate in accordance with the trust instrument, including the power to hold property unproductive of income and the power to buy, sell, exchange, and/or retain stock of any trustee that is a bank.

b) To sell, exchange, or otherwise dispose of, all or any part of the trust estate, publicly or privately.

c) To invest, pay, expend, or otherwise apply the trust estate for any purpose, in any manner, and in property of any description whatsoever; to make and/or hold investments of any part of the trust estate in common or undivided interest with any other person or entity, including property that any trustee, individually or otherwise, may hold in a common or undivided interest; *"and to deal with, buy from, or sell to, any person or entity, regardless of any relationship of such person or entity to any trustee"* (emphasis added).

d) To make oil, gas, and mineral leases; to pool or unitize any or all of the lands, mineral leaseholds, or mineral interests of the trust estate with lands, mineral leaseholds, or mineral interests of other persons, corporations, or trusts for the purpose of developing and producing oil or gas; to drill or contract for the drilling of wells for oil or gas; and to contract or arrange for any other act or thing whatsoever, whether the same be now or hereafter recognized or contemplated as common or proper practices by or among those engaging in the business of prospecting for, developing, producing, processing, transporting, and/or marketing any such minerals that may be deemed by the trustees to be advantageous to the trust estate.

e) To institute, join in, maintain, defend, compromise, submit to arbitration, or settle any claim or controversy by or against the trust, regardless of the manner in which such matter has arisen, all in the name of the trustees and without the consent of any beneficiary of the trust.

. . . . .

h) To evaluate any property that may belong to the trust estate, which evaluation at all times shall be binding upon all beneficiaries of the trust.

i) To hold, manage, invest, and account for the separate trust estates, either as separate funds or as a common fund, as the trustees think advisable; ...

j) To construe the will in favor of the validity of any act or omission by or of the trustees; and the trustees are also authorized to exercise all the rights, powers, options, and privileges now or hereafter granted to, provided for, or vested in trustees under the Texas Trust Act, except such as conflict with the terms of this will, and, insofar as it is possible, no subsequent legislation or regulation shall be in limitation of the rights, powers, or privileges granted in this will or in said Texas Trust Act as it existed at the time of the making of this will. Generally without being limited by the foregoing, the trustee shall hold, manage, control, use, and

*invest and reinvest, and dispose of the trust estate in the sole discretion of the trustee in all things, under all circumstances, and to the same extent, as if the trustee were the owner thereof, in fee simple,* all rights, privileges, and powers given to the trustee may be exercised without application to any court (emphasis added).

Clearly, it was intended that the trustees of the trust created under the wills of Mr. and Mrs. Cullen were to have the widest possible powers, including at least in certain instances, the power to self-deal.

The trusts were not fully funded for several years, while the oil and gas properties they owned produced sufficient income to pay most of the estate taxes and other obligations of the estate. During this time, 5½ lots in Galveston County (the "Bayshore Property") were sold to Isaac Arnold, Sr., husband of executrix Agnes Arnold; a Houston Country Club membership was

sold to Mrs. Arnold; and some Rice University football-ticket options were sold to several people, including the husbands of the executrices. The executrices sold the 127 shares of Quintana Petroleum stock from the Cullen Estates as follows: 34 to Corbin J. Robertson, 34 to Douglas B. Marshall, 24 to Isaac Arnold, Sr., 24 to Harry H. Cullen, and 11 to Roy H. Cullen. At that time, all of them were shareholders of Quintana and active workers in the business. They also constituted a majority of the board of directors of Quintana. No one has been elected president of Quintana since Mr. Cullen's death. The stock was sold for $148.00 per share, a sum in excess of the federal estate tax valuation.

In his deposition, Enrico diPortanova testified that about the year 1962, he hired Peter Borre, an American lawyer, to represent him when dealing with Quintana and the Houston Cullen family.

In 1964, Enrico moved to Houston to investigate his inheritance further. He was suspicious of his Houston relatives, who he believed were not handling his own and Ugo's affairs in accordance with their grandparents' wills. In February 1967, Ugo was declared non compos mentis by the County Court of Harris County, and Enrico was appointed guardian of Ugo's estate. Enrico soon filed a petition and notice to show cause against the trustees of Ugo's trust in the County Court of Harris County, demanding increased distributions. That action was dismissed for want of jurisdiction. The trustees then filed a declaratory judgment action in district court, naming Enrico, as guardian of Ugo's estate, as defendant and seeking an interpretation of their obligations under the Cullen wills. Enrico intervened individually and filed a cross-action on his and Ugo's behalf naming Wilhelmina Robertson, Agnes Arnold, Margaret Marshall, Isaac Arnold, Sr., Douglas B. Marshall, Corbin J. Robertson, and Roy H. Cullen as individual cross-defendants. The cross-action demanded that cash and stocks be distributed from the corpus of the trust, that the Cullen family and the directors of Quintana be discharged as trustees, and that the court

order an accounting of the trusts established for the benefit of the diPortanovas.

About the same time, Enrico employed Ed Condon and authorized him to deal with Quintana and the Cullen family, and in particular, to receive and evaluate any information regarding the Cullen estates and the trusts. In April of 1967, while Enrico, the Cullens, and their attorneys were negotiating a settlement of the litigation, Mr. Condon retained the accounting firm of Ernst & Ernst to conduct a special examination, which the examiner testified was a broad review of the assets and liabilities that related to Mr. diPortanova's interests as they may have occurred through his inheritance. Mr. Mauer, an examiner for Ernst & Ernst, testified that he was requested to find the answers to the following questions: "Who owns the existing Quintana Petroleum Corporation? Why didn't Lillie Cullen diPortanova have a stock interest in Quintana? Do any of the other children's beneficiaries have a stock interest in Quintana?" A Quintana employee provided Ernst & Ernst with a list of the current stockholders and confirmed that until their deaths, Mr. and Mrs. Cullen owned over 50% of the outstanding stock. Quintana supplied Ernst & Ernst with copies of the Cullens' wills and audits of the Cullens' estates and testamentary trusts.

In late July of 1967, Ernst & Ernst delivered the report of special examination to Mr. Condon. Under the section entitled "Special areas of review" is found a report on the 250 outstanding shares of Quintana stock, which identified the shareholders and the number of shares held by each as of March 31, 1967. The report also noted that the real property records of Galveston County reflected that Isaac Arnold, Sr., had purchased the Bayshore property from the estate of H.R. Cullen in 1960.

In January of 1968, the litigation between the trustees, the Cullens, and the diPortanovas was settled. Margaret Marshall and Wilhelmina Robertson agreed to resign as trustees of the estate trusts for Enrico and Ugo, to be succeeded by trus-

tees of Enrico's choosing. Agnes Cullen Arnold had already resigned as a trustee. The trustees also agreed, with the court's approval, to distribute the cash and marketable securities from the trusts to Enrico, individually and as guardian of the estate of Ugo. In the formal agreement dated January 10, 1968, Enrico, individually and as guardian of the estate of Ugo diPortanova, released Margaret Marshall and Wilhelmina Robertson "and their predecessor trustees, individually and collectively, of any and all liability with respect to all transactions revealed or reflected by the audit reports and the tax returns heretofore furnished to diPortanova or his agents." The trustees were not released from liability for fraud.

As part of the 1968 settlement, Southern National Bank, Houston National Bank, and Joe Nalle succeeded Margaret Marshall and Wilhelmina Robertson as trustees of the estate trusts for Enrico and Ugo.

The new trustees agreed that Houston National Bank (now RepublicBank) would be responsible for administering the estate trusts and Southern National Bank (now Texas-American) would be responsible for the Louisiana trusts. Robert Lawrence was the lead trust officer at Houston National Bank and responsible for discharging the bank's duties as successor trustee. He testified that he reviewed the inventories and audits of the Cullen estates, but was "disturbed" that no final accounting of the estates had been filed. Mr. Lawrence testified that he had information that the executors from whom the trusts flowed had not filed a final accounting. He testified that it was standard operating procedure with an executrixship that a final accounting be filed and that a trustee looks for the final accounting. They asked for and received an accounting of the trust of H.R. and Lillie Cullen, which was normal operating procedure. Before the banks agreed to act as trustees, they demanded an indemnity agreement from Enrico, concerning all estate and trust transactions prior to their becoming trustees.

On July 25, 1979, Paolo diPortanova, as guardian of the person of Ugo; Ugo and Enrico, as beneficiaries of certain trusts; and Enrico, Gregory O. Hovas, and A.R. Schwartz, as trustees of certain trusts, filed suit against Quintana Petroleum Corporation, alleging that it stood in a fiduciary capacity to all of the plaintiffs and that it had breached its fiduciary duties. The plaintiffs sought a full accounting from Quintana Petroleum Corporation and requested that the court impose a constructive trust upon all trust assets to prevent unjust enrichment and to enter appropriate orders where inequity was found.

RepublicBank, Texas American Bank, and Gregory Hovas (who succeeded Joe Nalle), trustees of the estate trusts, intervened in the application for accounting. InterFirst Bank-Houston, as guardian of the estate of Ugo; Texas American Bank, as trustee of the H.R. and Lillie C. Cullen estate trusts for Ugo; Paolo diPortanova, as guardian of the person of Ugo; and RepublicBank and Gregory Hovas, as trustees for the Cullen estate trusts for Ugo, filed a petition against the independent executors of the estate of Agnes Cullen Arnold, deceased; the independent executors of the estate of Isaac Arnold, deceased; and Quintana Petroleum Corporation, alleging that the sale of Quintana Petroleum stock by the executrices was in violation of section 352 of the Texas Probate Code. InterFirst Bank and James Patrick Smith, attorney ad litem for Ugo, filed cross-claims against the successor trustees, alleging that the successor trustees failed to exercise the degree of care required of them upon succession to collect property and claims belonging to the trusts. The successor trustees advanced similar cross-claims and counter-claims against Smith and InterFirst.

The plaintiffs, defendants, and intervenors all filed motions for partial summary judgments. All motions were denied. After several requests for admissions were filed and answered, additional motions for partial summary judgments and motions for summary judgment were filed by the

various parties. The trial court entered an order which:

(1) granted the summary judgment of the defendants, Quintana Petroleum Corporation; Corbin J. Robinson, Douglas B. Marshall; Margaret Cullen Marshall; Wilhelmina Cullen Robertson, Isaac Arnold, Jr., Roy H. Cullen, and Harry H. Cullen, on all claims asserted against them in this cause by plaintiffs and intervenors;

. . . . .

(2) granted the motion for partial summary judgment of the cross-defendants, Texas American Bank-Houston, N.A., RepublicBank-Houston, N.A., Gregory Hovas, and Joe Nalle, on all causes of action asserted against them by cross-plaintiffs, InterFirst Bank-Houston, N.A., and James Patrick Smith;

. . . . .

(3) granted the motion for partial summary judgment of cross-defendant, Interfirst Bank-Houston, N.A., on all causes of action by cross-plaintiffs, Texas American Bank-Houston, N.A., and Republic-Bank-Houston, N.A;

. . . . .

(4) ordered that the cross-action against the cross-defendants, John Neale, A.R. "Babe" Schwartz, and Gregory Hovas, be dismissed for lack of jurisdiction over the cross-defendants or alternatively that if the court had jurisdiction, it declined to exercise it as a matter of comity;

. . . . .

(5) granted the motion for partial summary judgment of the cross-defendant, InterFirst Bank-Houston, N.A. on all causes of action arising from the sale or transfer of assets of H.R. and Lillie C. Cullen asserted by cross-plaintiffs, Enrico diPortanova, Gregory Hovas, Paul diPortanova, and James Patrick Smith.

■ The first issue to be considered is the effect of section 352 of the Probate Code on the sales of Quintana Petroleum Corporation stock made by Agnes Arnold, Margaret Cullen Marshall, and Wilhelmina Cullen Robertson, executrices. The statute provides: "The personal representative of an estate shall not become the purchaser, directly or indirectly, of any property of the estate sold by him, or by any co-representative." It then provides a procedure whereby any person "interested in the estate" may file a complaint with the court "in which the proceedings are pending," and provides that upon service of citation and after hearing and proof, such sales "shall be by the court declared void." It thus appears that the sale can be protested only by one who is an heir or a legatee. The statute does not provide that such sale is void, but rather provides that the court shall declare it void. Instead of declaring a conveyance of property in violation of the statute void, the court is directed by the statute, where a proper attack on a sale of property is made, to order the property reconveyed to the estate, a procedure that would be unnecessary if the previous sale was void. The effect of this statute is to render sales of property in violation thereof voidable. *Tompkins v. Holman*, 537 S.W.2d 98 (Tex.Civ.App.—Austin 1976, writ ref'd n.r.e.); *Pierson v. Smith*, 292 S.W.2d 689 (Tex.Civ.App.—Eastland 1956, writ ref'd n.r.e.); *Dilbeck v. Blackwell*, 126 S.W.2d 760 (Tex.Civ.App.—Texarkana 1939, writ ref'd).

■ From the extensive powers granted in the will to the trustees, and therefore to the executrices, we conclude that the testators intended to authorize the executrices and the trustees to sell estate property to their husbands and their nephews.

The agreement of 1943, signed by all of the stockholders of the Quintana Petroleum Corporation, whereby the sale of stock in the corporation was restricted to the present stockholders in the corporation and the active workers in the business of the corporation, reflected that Mr. Cullen, the majority stockholder, intended that all stock be held by people active in the business of this corporation.

The mutual promises of the parties provided consideration for the agreement.

*Langley v. Norris,* 141 Tex. 405, 173 S.W.2d 454 (1943).

Had the executrices failed to comply with the contract, certainly the stockholders who were not related to the executrices could have required that the stock be sold to them. *Humble Oil & Refining Co. v. Westside Investment Corp.,* 428 S.W.2d 92 (Tex.1968). Once they acquired the stock, they would have been bound by the terms of the contract to consent to its redistribution. The summary judgment evidence shows that in 1946, Mr. Cullen issued some of his stock to Mr. Marshall and Mr. Robertson and required them to join in the stockholders' agreement. Other men active in the business were permitted to acquire stock in 1947, 1949, 1951, and 1962. In each instance they were required to join in the stockholders' agreement. The evidence shows that in 1962, Mr. Arnold, Mr. Marshall, and Mr. Robertson reaffirmed the agreement in writing because they had acquired additional stock. Keeping the stock ownership in the hands of those who were active in the business of the corporation was the clear purpose.

Because the executrices voluntarily complied with the provisions of the contract requiring that the stock be sold to the remaining stockholders, no action was necessary or was brought for specific performance as authorized by Tex.Prob.Code Ann. sec. 27 (Vernon 1980). Accordingly, this court is not presented with the question of whether section 27 constitutes an exception to the rule of section 352. This question was presented in *Faubion v. Corder,* 554 S.W.2d 266 (Tex.Civ.App.—Eastland 1977, dism'd as moot), and the Court of Civil Appeals held that the provisions of section 27 prevailed over section 352. Since the case became moot while pending in the Supreme Court, and was dismissed, the decision is not authoritative. However, we agree with its reasoning.

■ Under the facts of this case, we find that the self-dealing, of which complaint has been made, was not contrary to public policy and was not void ab initio. In addition, we are of the opinion, under the facts of this case, that the sale of stock by the executrices to their nephews, Roy and Harry Cullen, did not constitute a violation of section 352. The purchase by the nephews was not a purchase either directly or indirectly by the executrices.

Section 352 of the Probate Code authorizes an action to set aside a sale of estate assets in violation thereof in the court "in which the proceedings are pending."

■ Tex.Prob.Code Ann. sec. 5(d) (Vernon 1980) provides that all courts exercising original probate jurisdiction shall have the power to hear all matters incident to an estate. This means that the court has power to hear all matters incident to an estate only in those instances where a probate proceeding, such as the administration of an estate, is actually pending in the court in which the suit is filed, relating to a matter incident to that estate. *Pullen v. Swanson,* 667 S.W.2d 359 (Tex.App.— Houston [14th Dist.] 1984, writ ref'd n.r.e.).

It has also been held that to come within subdivision (d) of section 5 of the Probate Code, the outcome of the additional controversy must be necessary to the resolution of the particular estate. *Farah v. Fashing,* 666 S.W.2d 341 (Tex.App.—El Paso 1984, orig. proceeding).

Prior to 1955, the courts had no power to close an independent administration of an estate, and the holdings were to the effect that the independent administration terminated when the estate was fully administered or when the claims were paid and distribution completed. In that year, sections 151 and 152 of the Texas Probate Code became effective and permitted the closing of estates by the affidavit of the independent executor or by court order. Neither of these closing procedures provide a method by which the independent executor may have his accounts audited and be discharged. It has been held that section 151 was designed only to allow the closing of an independent administration to appear of record. *Burke v. Satterfield,* 525 S.W.2d 950 (Tex.1975). The closing by a

court order under section 151 does no more.

Since the closing procedures provided by Sections 151 and 152 are not mandatory, the final distribution of an estate's assets after all debts and claims against the estate are paid results in the closing of the estate. *Pugh v. Turner*, 145 Tex. 292, 197 S.W.2d 822 (1946); *Stiles v. Hawkins*, 207 S.W. 89 (Tex.Comm'n App.1918, opinion adopted); 17 M. Woodward and E. Smith, *Probate and Decedents Estates* sec. 512 (Texas Practice 1971).

Where the decedent's will fully distributes the estate and provides a means for partition, the Probate Court lacks jurisdiction to examine the account of the independent executor and grant him a discharge. The closing of an estate does not relieve the executor from his individual liability for mismanaging the estate, however. Tex.Prob.Code. secs. 152 and 153; *Rowland v. Moore*, 141 Tex. 469, 174 S.W.2d 248 (1943).

The record establishes that, long prior to the date on which this suit was filed, all claims against the estates of H.R. and Lillie C. Cullen were paid, and the assets of those estates were distributed as directed by their wills. The estates were closed, and the Probate Court lacked jurisdiction of the suit insofar as it was based on section 352 of the Code.

Enrico and Ugo diPortanova have no individual claims under section 352 of the Texas Probate Code, based on the administration of the Cullen estates. This section provides that a person interested in the estate may file a complaint. "Persons interested" refers to those with some "legally ascertained pecuniary interest." *Logan v. Thomason*, 146 Tex. 37, 202 S.W.2d 212 (1947).

Legal title to the trust property is held by the trustee. *Collins v. McCarty*, 68 Tex. 150, 3 S.W. 730 (1887). Since legal title to the property, as well as the right to possession and control, is vested in the trustees, the successor trustees are the

proper parties to bring an action to redress the alleged wrongdoing by the executrices in this case. *Byars v. Thompson*, 80 Tex. 468, 15 S.W. 1087 (1891). *See* G. Bogert, *The Law of Trusts and Trustees* sec. 869 (rev. 2d ed. 1982); 4 A. Scott, *The Law of Trusts* secs. 280, 282 (3d ed. 1967).

In their motion for summary judgment, the defendants in the trial court have alleged that all claims of all of the plaintiffs and intervenors were barred by limitations. In reply, the contention is made that since Ugo diPortanova had been judged incompetent prior to the date on which the bar of the statute would be complete, his disability prevents the statute of limitations from running until the disability is removed. A further contention is made that since this cause of action is in rem, being a proceeding in a estate, it can be asserted by the trustees of the other trusts who are parties to this action. These contentions are not sound.

As we have held, Ugo diPortanova lacks standing to assert his claim against the estate, since his only interest is as the beneficiary of a trust. It is the right and responsibility of the testamentary trustee to assure that all property willed into trust is properly conveyed by the executors of the settlor's estate. It is only when the trustee cannot or will not enforce the cause of action that he has against the third person that the beneficiary is allowed to enforce it. In such a case, the beneficiary is not acting on a cause of action vested in him, but is acting for the trustee, and the period of the statute of limitations should be computed from the time the trustee acquired his right to sue. The situation of the trustee with regard to competency, and not that of the beneficiary, is controlling as to the tolling of the statute of limitations. *Collins*, 68 Tex. at 153, 3 S.W. at 731; *Fisher v. Southland Royalty Co.*, 270 S.W.2d 677 (Tex.Civ.App.—Eastland 1954, writ ref'd n.r.e.); *see* G. Bogert, *The Law of Trusts and Trustees* secs. 869, 954 (rev. 2d ed. 1982); Restatement (Second) of Trusts sec. 177, Comment A (1959). The statute of limitations defense is not avoided

by reason of the incompetency of Ugo di-Portanova.

A further contention is made by appellants that their allegations of fraudulent conduct are not overcome by the summary judgment evidence and prevent the running of the statute of limitations until the fraud is discovered by or revealed to a fiduciary.

There are decisions holding that where there is a fiduciary relationship, actual knowledge of the transaction constituting a breach of fiduciary relations or fraud is required to start the running of the statute of limitations. *Baker v. Cook*, 15 S.W.2d 600 (Tex.Comm'n App.1929, holding approved).

 However, it is well settled that constructive notice in law creates an irrebuttable presumption of actual notice. The statute of limitations begins to run even in cases involving fraud, when the fraud might have been discovered through reasonable diligence. *Mooney v. Harlin*, 622 S.W.2d 83 (Tex.1981); *see Champlin Oil & Refining Co. v. Chastain*, 403 S.W.2d 376, 403 (Tex.1965) (op. on reh'g).

Hugh Roy Cullen died in 1957, and Lillie Cranz Cullen died in 1959. Their wills were duly probated in Harris County, Texas. On July 23, 1964, the executrices sold the shares of Quintana Petroleum stock in question. By the deed acknowledged on December 28, 1964, to be effective as of July 1, 1964, the executrices distributed all of the property remaining in the estate of H.R. Cullen. Likewise, by a deed acknowledged on September 7, 1965, to be effective January 1, 1965, the executrices distributed all of the property remaining in Mrs. Cullen's estate. Enrico diPortanova was appointed guardian of the estate of Ugo diPortanova in 1967. In 1968, Margaret Marshall and Wilhelmina Robertson resigned as trustees of the estate trust for Enrico and Ugo diPortanova. Agnes Cullen Arnold had previously resigned. In that same year, Texas American Bank, RepublicBank, and Joe Nalle became trustees of the trust for Enrico and Ugo. Gregory Hovas succeeded Joe Nalle prior to the institution of this suit on July 25, 1979.

At the time these successor trustees were appointed, the inventory, appraisal, and list of claims for the estate of Hugh Roy Cullen was on file and reflected ownership of 128 shares of Quintana Petroleum Corporation stock valued at the sum of $12,800. It also reflected the ownership of 500 shares of Quintana Gas Company, Houston, valued at $110,000 and 250 shares of Quintana Protection Company stock valued at $2834.59. The record finally contains a voucher issued to Vinson, Elkins, Weems and Searles, attorney and agent, as a refund voucher, H.R. Cullen estate, on which the notation appears "this closes docket." It is signed by Bruce Henderson, Deputy Clerk, Harris County, Texas.

The record also contains the United States estate tax return for the estate of Hugh Roy Cullen, reflecting that he owned 128 shares of Quintana Petroleum Corporation stock. This stock was listed as community property. The United States estate tax return of the estate of Lillie C. Cullen is also in the record. No stock in Quintana Petroleum Corporation is listed.

There is in the record audit reports of the H.R. Cullen estate trusts for the years 1961 through 1968 and of the L.C. Cullen estate trusts for the same years. In a note to the financial statements for the year ended December 31, 1964, the accountant points out that effective December 31, 1964, the final distribution of the H.R. Cullen estate was made to the H.R. Cullen estate trusts. None of the financial statements reflect ownership of Quintana Petroleum Corporation stock in any of the trusts.

In preparation for the filing of a lawsuit against the trustees of the various trusts in which he and his brother Ugo were beneficiaries, Enrico diPortanova secured an accounting by a certified public accountant firm of the trusts created for his benefit and for the benefit of his brother under the wills of Mr. and Mrs. Cullen. In their report, the accountants noted that Quintana Petroleum Corporation had issued 250 shares of common stock and named the

shareholders and number of shares that each held as of March 31, 1967. The report also noted that the real property records of Galveston County reflected that Issac Arnold, Sr., had purchased the Bayshore Property from the estate of H.R. Cullen in 1960.

When RepublicBank and Texas American Bank became trustees in 1968, the new trustees agreed that RepublicBank would be responsible for administering the estate trust, and Texas American would be responsible for the Louisiana estate trusts. Robert Lawrence, the man responsible for discharging the banks' duties as successor trustees, testified by deposition that he reviewed the inventories and audits of the Cullen estate. However, no further investigation as to the assets of the trusts received from the estates was made, the banks having required an indemnity agreement from Enrico diPortanova, concerning all estate and trust transactions prior to their becoming trustees.

In *Courseview, Inc. v. Phillips Petroleum Co.*, 158 Tex. 397, 312 S.W.2d 197, 205 (1957), the court said:

> [L]imitation does not begin to run in favor of a trustee and against the cestui until the latter has notice of a repudiation of the trust, and there is no duty to investigate at least until the cestui has knowledge of facts sufficient to excite inquiry.

In *Andretta v. West*, 415 S.W.2d 638 (Tex.1967), the court held that the statute of limitations began running when the plaintiff learned that the defendant, with whom he shared a confidential relationship, had received and was claiming royalties to which he was entitled or when he had information that would have led a person of ordinary prudence to a discovery of the facts.

In *Bush v. Stone*, 500 S.W.2d 885 (Tex. Civ.App.—Corpus Christi 1973, writ ref'd n.r.e.), the court cited *Ruebeck v. Hunt*, 142 Tex. 167, 176 S.W.2d 738 (1943), and *Wise v. Anderson*, 163 Tex. 608, 359 S.W.2d 876 (1962), in support of its holding that knowledge of facts that would have

excited inquiry into the mind of a reasonably prudent person, which, if pursued by him with reasonable diligence, would lead to the discovery of the fraud, is equivalent to knowledge of the fraud as a matter of law. *Wise* held that a person's knowledge that no well had been commenced within the time prescribed for drilling was "knowledge of facts which would cause a reasonably prudent person to make inquiry," and constituted knowledge of the fraud.

The defendant in a fraud case, who was the movant for summary judgment, was held to have the burden of proving when the fraud was, or *should have been*, discovered in order to set the statute of limitations running. *Romo v. Glascock*, 620 S.W.2d 829 (Tex.Civ.App.—Dallas 1981, no writ).

■ There is no harshness in holding that the trustees of a testamentary trust are charged with knowledge of the gifts made to the trusts that they are administering by the testator's will, the information furnished by the inventory and appraisal filed in the testator's estate, the various properties transferred from the estate into the trust that they are administering, and the content of the audits made by previous trustees. The information furnished from these sources in this case is sufficient as a matter of law to require the trustee to begin an inquiry, and the record shows that a diligent inquiry would have led to the discovery of the "self-dealing" transaction about which complaint has been made.

The trial court did not err in granting the summary judgment of the defendants, Quintana Petroleum Corporation, Corbin J. Robinson, Douglas B. Marshall, Marshall Cullen, Wilhelmina Cullen, Isaac Arnold, Jr., Roy H. Cullen, and Harry H. Cullen, on all claims asserted against them in this cause by Texas American Bank-Houston, N.A., RepublicBank-Houston, N.A., Gregory Hovas, Enrico diPortanova, InterFirst Bank-Houston, N.A., James Patrick Smith, and Joe Nalle, because their claims are

barred by the two- and four-year statutes of limitations.

InterFirst Bank contends that the trial court erred in dismissing its cross-claim as guardian of Ugo diPortanova, N.C.M., against Gregory Hovas, A.R. Schwartz, and John Neale, the trustees of the Louisiana trusts created for the benefit of Ugo diPortanova under the wills of his grandparents. InterFirst Bank sought an accounting for certain distributions from the Louisiana trusts, a refund of any unauthorized distributions, and the removal of Schwartz, Hovas, and Neale as trustees. In its final judgment, the trial court dismissed InterFirst's claim on the ground that it lacked jurisdiction, or alternatively, that it declined to exercise jurisdiction as a matter of comity to the Louisiana court that had previously exercised jurisdiction over the administration of the Louisiana trusts.

We find it unnecessary to consider the question of jurisdiction since the trial court properly declined to exercise jurisdiction as a matter of comity.

 The doctrine of comity involves considerations of convenience and expediency, as well as deference to the courts of a sister state. As a matter of comity, a court may properly refuse to exercise jurisdiction over a matter that has already been the subject of another court's jurisdiction. *See Nowell v. Nowell,* 408 S.W.2d 550 (Tex. Civ.App.—Dallas 1966, writ dism'd), *cert. denied,* 389 U.S. 847, 88 S.Ct. 53, 19 L.Ed.2d 116 (1967).

 The decision to apply the doctrine of comity and to defer to a foreign court rests in the sound discretion of the forum court. *Nowell,* 408 S.W.2d at 553; *see generally* 2 R. McDonald, *Texas Civil Practice in District and County Courts* sec. 7.09 (rev. ed. 1982). To prove an abuse of discretion, there must be a showing of more than a mere error of judgment. Rather, the appellant must prove that the trial court acted arbitrarily or unreasonably. *See, e.g., Southwestern Bell Telephone Co. v. Johnson,* 389 S.W.2d 645, 648 (Tex.1965).

 InterFirst has not shown that the trial court clearly abused its discretion by declining to exercise jurisdiction as a matter of comity. The court properly deferred to the Louisiana court's jurisdiction on the general principle that the court where the trust property is located has the power to remove the trustee, whether or not it has personal jurisdiction over that trustee. Restatement (Second) of Conflict of Laws sec. 276, Comment b (1971); 5 A. Scott, *The Law of Trusts* sec. 646 (3d ed. 1967).

The Louisiana court has statutory jurisdiction to hear challenges to the administration of the trusts by the trustees, and is empowered to remove the trustees. Its decisions bind even beneficiaries outside its jurisdiction. It is an appropriate court to hear any such action against the trustees. *See* 5 A. Scott, *The Law of Trusts* sec. 646.

InterFirst contends that under Louisiana law, InterFirst is not a permissible party to assert its claims against the trustees, but it has not shown that Ugo diPortanova will therefore be left without a remedy. Louisiana law provides that while a curatorship is in existence, the proper party to assert any claims in which Ugo diPortanova, N.C.M., has an interest is his curator, Paolo diPortanova. If the interests of the curator are found to conflict with those of his ward, a court-appointed undercurator will be required to bring the action on behalf of the ward. La.Code Civ.P.Ann. art. 4553, 4202 (West 1961).

Although the decisions are not unanimous, as a general rule it is held that the administration of a trust imposed on land is governed by the law of the state where the land is located and must be supervised by the courts of that state. *See, e.g., Petition of Schwarz,* 61 N.Y.S.2d 578, 580 (N.Y.Sup. Ct.1946); *see generally* Restatement (Second) of Conflict of Laws sec. 276; 5 A. Scott, *The Law of Trusts* sec. 646.

 Jurisdiction over the actions of the trustees of the Louisiana trusts is properly in the state where the trust property is

located, and in the Louisiana court that has been administering the trusts for more than 20 years, the 16th Judicial District Court in St. Mary's Parish, Louisiana. Where the jurisdiction of a court has attached, and the proceeding is quasi in rem, as is the administration of a trust, other courts should not interfere with that jurisdiction. *See Princess Lida v. Thompson*, 305 U.S. 456, 59 S.Ct. 275, 83 L.Ed. 285 (1939); *Swanson v. Bates*, 170 F.2d 648, 651 (10th Cir.1948).

The court that appointed the trustee and in whose jurisdiction the trust property is located is the proper forum in which to bring suit. The trial court did not abuse its discretion in dismissing InterFirst Bank's cross-claim as guardian of Ugo diPortanova against the trustees of the Louisiana trusts.

Texas American Bank and RepublicBank, as co-trustees of the Cullen estate trusts for the benefit of Ugo diPortanova and Enrico diPortanova, contend that the trial court erred in dismissing the guardian ad litem appointed to represent the minor, unknown, and undetermined beneficiaries of the Arnold, Marshall, and Robertson estate trusts.

After his appointment, the guardian ad litem sought a declaration that the 1964 sale by the executrices of the Quintana Petroleum Corporation stock had violated section 352 of the Texas Probate Code. The trustees of the Arnold, Marshall, and Robertson estate trusts, a few months thereafter, assigned all claims of these minor, unknown, and undetermined beneficiaries to the primary adult beneficiaries of the trusts. Upon motion by the trustees, the trial court then severed the claim of the guardian ad litem. On June 24, 1983, the court dismissed these claims without prejudice and discharged the guardian ad litem.

▪ Neither Texas American Bank nor RepublicBank were parties to that severed action, and they assert no other valid basis for standing to complain of the dismissal.

*See Gunn v. Cavanaugh*, 391 S.W.2d 723 (Tex.1965). No appeal was timely perfected from the final order dismissing the guardian ad litem, and the severed cause no. 94,467–C, by any party entitled to bring such an appeal, and this court is therefore without jurisdiction to review that decision.

The motion to dismiss the points of error relating to the guardian ad litem's discharge, filed herein by the appellees, is granted for the reason that Texas American Bank and RepublicBank lack standing to appeal the order of dismissal, since they were not parties to that action.

InterFirst Bank, as the guardian of Ugo diPortanova, contends that the trial court erred in granting summary judgment against InterFirst on its cross-claim alleging a breach of trust by the successor trustees of the Cullen estate trusts for the benefit of Ugo diPortanova. In the trial court, InterFirst had alleged that, should the claim for the executrices' violation of section 352 be barred because of laches or the statute of limitations, then the successor trustees should be held contingently liable for failing to timely discover and pursue this claim on behalf of Ugo diPortanova.

This contention cannot be sustained. These claims are barred by the judgment entered in cause no. 730,465, *Isaac Arnold, et al. Trustees v. Enrico diPortanova, Guardian of Ugo diPortanova*, in the 113th Judicial District Court of Harris County, Texas, as well as by the releases executed in connection therewith.

▪ InterFirst's cause of action in this case involves essentially the same subject matter as was involved in the 1967 suit. That action examined the administration of the diPortanova estate trusts by the predecessor trustees. It also involved substantially the same parties. Res judicata extends not only to the immediate parties in a prior suit, but also to those in privity with them. *Kirby Lumber Corp. v. Southern Lumber Co.*, 145 Tex. 151, 154, 196

S.W.2d 387, 388 (1946). Since the successor trustees and the successor guardian are in privity with their predecessors as trustees and as guardian, they are also subject to the res judicata effect of the 1968 judgment. *See Benson v. Wanda Petroleum Co.,* 468 S.W.2d 361 (Tex.1971).

■ The indemnity agreement entered into between Enrico diPortanova and the successor trustees was a pre-condition to the acceptance by these banks and individuals of fiduciary responsibility as trustees. Enrico diPortanova, individually and as guardian of Ugo diPortanova, released and indemnified these successor trustees. The agreement recited that Enrico diPortanova had examined the final accounting of each trust furnished by the former trustees upon their resignations. He agreed that in accepting their respective appointments, the successor trustees could rely upon and accept those accountings. He further agreed that the successor trustees were to have no obligation or duty whatsoever to investigate or to review the administration by the former trustees. He then expressly agreed to hold the successor trustees harmless from, and to indemnify them for, any responsibility for the acts, accounting, and administration of the former trustees. The Probate Code in effect in 1968 did not specifically require approval by the probate court to authorize such an agreement. Texas Probate Code Ann. sec. 234 (Vernon 1955).[1] InterFirst, as successor guardian to Enrico diPortanova, is bound by the agreement executed by its predecessor. *See* Tex.Prob.Code Ann. secs. 224, 226 (Vernon 1980).

■ This agreement did not violate public policy. The basis for relieving the successor trustees of their duty to investigate was a practical one. An extensive investigation of the previous administration of the trusts had been conducted in connection with the 1967 lawsuit. It was reasonable for the parties to attempt to avoid spending additional trust assets on another investigation, duplicating the guardian's earlier effort. *See Wichita Royalty Co. v. City National Bank,* 109 F.2d 299, 304 (5th Cir.), *cert denied,* 310 U.S. 644, 60 S.Ct. 1097, 84 L.Ed. 1411 (1940).

Finally, as to the appellee Hovas, who became a successor trustee in 1977, the section 352 claim was barred by limitations long before he agreed to become a trustee. His failure to discover the cause of action could not have resulted in injury to Ugo diPortanova. The trial court did not err in granting summary judgment against InterFirst on its cross-claim alleging breach of trust by the successor trustees.

The judgment of the trial court is affirmed.

---

1. Ch. 55, sec. 234, 1955 Tex.Gen.Laws 88, *amended by* ch. 173, sec. 15, 1971 Tex.Gen.Laws 984.