COURT OF APPEALS









COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS

 




 
 
  
 ROBERTO
 GALLARDO, JR., INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ROBERTO
 GALLARDO, DECEASED,
  
                             Appellant,
  
 v.
  
 ADRIAN O.
 UGARTE, M.D.,
  
                             Appellee.
 
 
  
 '
  
 '
  
 '
  
 '
  
 '
 
 
  
 No. 08-03-00374-CV
  
 Appeal from the
  
 120th District Court
  
 of El Paso County, Texas
  
 (TC#2003-2413)
 
 




 

                                                                  O
P I N I O N

The trial court dismissed this
medical malpractice suit on the ground that the plaintiff failed to file an
adequate expert report.  We reverse and
remand.

Factual and
Procedural Background

Roberto Gallardo died in August
1999.  He was a resident of Sunset Haven
Nursing Center and a patient of Appellee Adrian O. Ugarte.  In July
2001, Gallardo=s son, Appellant Roberto Gallardo,
Jr., sued Sunset, Ugarte, and other health-care
providers, claiming that they were negligent in caring
for Gallardo.








In November 2001, Sunset filed a
Motion to Acknowledge and Enforce Stay. 
The motion stated that Sunset=s insurer had been placed into
liquidation in Pennsylvania.  The
Pennsylvania court=s Order of Liquidation, entered on October 3, 2001, included
a ninety-day stay of all Pennsylvania proceedings in which the insurer was
obligated to defend a party.  The order
also included a request that courts in other jurisdictions honor the stay on
the basis of comity.  The trial court in
this case granted Sunset=s Motion to Acknowledge and Enforce Stay and entered the
following order:

[T]his
matter is Stayed in compliance with the Order of
Liquidation issued by the Commonwealth of Pennsylvania and all matters
pertaining to this suit are stayed for 90 days from October 3, 2001, including,
but not limited to, discovery in this case, the trial of this case and all
currently imposed deadlines until further notice.  

 

In January 2002, Appellant served the
defendants with an expert report by Dr. Gunda
Kirk.  On April 29, 2003, Ugarte filed a motion to dismiss the claims against him on
the ground that Kirk=s report did not constitute a good faith effort to comply
with the definition of an expert report.  The record does not reflect that Appellant
filed a response to the motion to dismiss, and Appellant=s counsel did not appear at the
hearing on the motion.  The trial court
granted the motion to dismiss and later severed the claims against Ugarte from Appellant=s remaining claims.[1]








The Expert
Report Requirement

The Medical Liability and Insurance
Improvement Act required a health-care- liability claimant to furnish an expert
report within 180 days after the claim was filed.  See Act of May 5, 1995, 74th Leg.,
R.S., ch. 140, ' 1, 1995 Tex. Gen. Laws 985, 986
(formerly codified as Tex. Rev. Civ. Stat. Ann. art. 4590i,
' 13.01(d)).[2]  A>Expert report= means a written report by an expert
that provides a fair summary of the expert=s opinions . . . regarding applicable
standards of care, the manner in which the care . . . failed to meet the
standards, and the causal relationship between that failure and the injury,
harm, or damages claimed.@  Tex. Rev. Civ. Stat. Ann. art.
4590i, ' 13.01(r)(6).  A defendant may challenge the adequacy of an
expert report.  The trial court must
sustain the challenge Aonly if it appears to the court, after hearing, that the
report does not represent a good faith effort to comply with the definition of
an expert report . . . .@  Id. ' 13.01(l).  If the court sustains the challenge, it must
dismiss the claim with prejudice.  Id.
' 13.01(e)(3).








Existence of
the Stay

In his first issue, Appellant argues
that the trial court erred in dismissing his claims against Ugarte
because the deadline for filing the expert report was suspended as a result of
the stay.  To support this argument,
Appellant relies on cases involving the automatic stay provided for by the
Texas Property and Casualty Insurance Guaranty Act.

The Act requires a stay of
proceedings in which an Aimpaired insurer@ is a party or is obligated to defend
a party.  See Tex. Ins. Code Ann. art. 21.28-C,
' 17(a) (Vernon Supp. 2004).  AImpaired insurer@ is defined in the Act as an insurer
that has been placed in receivership, liquidation, or conservatorship
Aand that has been designated an
impaired insurer by the commissioner.@ 
See id. ' 5(9).  ACommissioner@ means the commissioner of
insurance.  See id. ' 5(6).

The stay lasts for six months from
the date the insurer is designated as impaired and for Aany additional time thereafter as may
be determined by the court . . . .@ 
Id. ' 17(a).  Analogizing to
bankruptcy stays, courts have held that actions taken while the stay is in
effect are void.  Builders Transp., Inc. v. Grice-Smith, 63 S.W.3d 822, 823 &
n.2 (Tex. App.--Waco 2001, no pet.); Burrhus
v. M & S Mach. & Supply Co., 897 S.W.2d 871, 872-73 (Tex. App.--San
Antonio 1995, no pet.).








The Fourteenth Court of Appeals has
considered the effect of the stay on the deadline for filing an expert
report.  See Tibbetts v. Gagliardi, 2
S.W.3d 659 (Tex. App.--Houston [14th Dist.] 1999, pet. denied).  In Tibbetts,
the deadline for filing expert reports was in July 1997.  Id. at 661.  In April 1997, an automatic stay commenced
because the insurer of two defendants was designated as impaired.  Id. 
In April 1998, the defendants filed motions to dismiss because of the
plaintiff=s failure to file expert
reports.  Id.  The defendants contended that the automatic
stay was lifted in October 1997--six months after it took effect.  Id. at 664.  But the record did not contain an order
lifting the stay and there was nothing to indicate that the stay was lifted in
October.  The record contained a letter,
a docket entry, and a scheduling order indicating that the stay was extended to
February 1998.  Id.  The appellate court therefore concluded that
the stay was in effect until sometime in February 1998.  Id. 
The court further concluded that the plaintiff was not required to file
expert reports while the stay was in effect. 
Id.

Appellant argues that this case is
factually similar to Tibbetts.  The trial court=s order stayed the proceedings for A90 days from October 3, 2001,
including, but not limited to, discovery in this case, the trial of this case
and all currently imposed deadlines until further notice.@ 
As Ugarte concedes, this language is
confusing.  It is not clear whether the
trial court intended the stay to last for ninety days or until further
notice.  Focusing on the words Auntil further notice,@ Appellant argues that, as in Tibbetts, there is nothing in the record to show
that the stay was ever lifted. 
Therefore, the stay remains in effect and the deadline for filing the
expert report remains suspended.








Appellant did not make this argument
in the trial court.  As noted above, he
did not file a response to the motion to dismiss or appear at the hearing on
the motion.  Although Appellant filed a
motion for new trial, he did not argue that the stay was in effect when the
trial court dismissed his claims against Ugarte, nor did he argue that he was not given notice of
the motion to dismiss or of the hearing on the motion.








To preserve an issue for appellate
review, the complaining party must generally raise the issue in the trial
court.  See Tex. R. App. P. 33.1(a)(1).  But
jurisdictional issues 
may be raised for the first time on appeal.  McGuire v. McGuire,
18 S.W.3d 801, 804-05 (Tex. App.--El Paso 2000, no pet.).  There is authority for the proposition that a
judicial action is void if taken during the pendency
of a stay mandated by the Texas Property and Casualty Insurance Guaranty
Act.  See, e.g., Burrhus, 897 S.W.2d at 873.  Here, however, there is nothing in the record
to indicate that the Texas Commissioner of Insurance had designated Sunset=s insurer as impaired.  Thus, there is nothing to indicate that the
stay was mandated by the Act.  Instead,
the record demonstrates that the trial court granted the stay as an act of
comity.  Such a stay is within the
discretion of the trial court.  See
Sanchez v. Huntsville Indep. Sch.
Dist., 844 S.W.2d 286, 291 (Tex. App.--Houston [1st Dist.] 1992, no writ) (AA motion to stay is directed to the
discretion of the court . . . .@); Interfirst
Bank-Houston, N.A. v. Quintana Petroleum Corp., 699 S.W.2d 864, 877 (Tex.
App.--Houston [1st Dist.] 1985, writ ref=d n.r.e.) (AThe decision to apply the doctrine of
comity and to defer to a foreign court rests in the sound discretion of the
forum court.@). 
Appellant has not cited any authority for the proposition that a trial
court=s purported violation of its own stay
order may be raised for the first time on appeal.  We therefore conclude that this issue is not
preserved for review.[3]

We also conclude that Tibbetts is distinguishable from this case.  In Tibbetts,
the record indicated that the stay had not been lifted.  See 2 S.W.3d
at 664.  In this case, the record
indicates that the stay had been lifted. 
The ninety-day period expired on January 1, 2002.  On January 11, 2002, Appellant served the
defendants with the expert report.  
Sunset, which requested the stay, filed discovery responses on January
25, 2002 and a designation of lead counsel on June 6, 2002.  These actions suggest that Appellant and the
party that requested the stay understood that the stay expired at the end of
the ninety-day period.  To the extent
Appellant is asserting that the stay would remain in effect until the trial
court gave Afurther notice,@ we note that the court signed an
order on April 23, 2003, setting a hearing for May 6, 2003.  Appellant=s counsel=s phone or fax number is listed on
the order, and Appellant does not assert that he was unaware of the order.  Thus, the trial court provided Appellant with
notice that the stay was no longer in effect.

Appellant=s first issue is overruled.

Adequacy of
the Report

The Legal Standards








For the claimant to avoid dismissal,
the expert report must represent a good-faith effort to provide a fair summary
of the expert=s opinions.  Am. Transitional Care Ctrs. v. Palacios, 46 S.W.3d 873, 878 (Tex. 2001).  Although the report need not marshal all the
plaintiff=s proof, it must include the expert=s opinions on the three
elements--standard of care, breach, and causation--identified in the
statute.  Id.  All of the relevant information must be
contained within the four corners of the report.  Id. 
To constitute a good-faith effort, the report must provide enough
information to fulfill two purposes.  AFirst, the report must inform the
defendant of the specific conduct the plaintiff has called into question.  Second, and equally important, the report
must provide a basis for the trial court to conclude that the claims have
merit.@ 
Id. at 879.  A report does not fulfill these two purposes
if it merely states the expert=s conclusions about the standard of care, breach, and
causation.  Id.  The expert must explain the basis of her
statements so as to link her conclusions to the facts.  Bowie Mem. Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002).  But a report=s adequacy does not depend on whether
the expert uses any particular Amagical words.@ 
Id. at 53.








Regarding the standard-of-care and
breach elements, the supreme court has stated: AIdentifying the standard of care is
critical:  Whether a defendant breached
his or her duty to a patient cannot be determined absent specific information
about what the defendant should have done differently.@ 
Palacios, 46 S.W.3d at 880.  Although the report need not include a full
statement of the standard of care and how it was breached, it must explain what
care was expected but not given.  Id.  Regarding the causation element, the supreme court has held that the expert report need not
express the causal relationship in terms of Areasonable medical probability.@ 
Bowie, 79 S.W.3d at 53.

We review a trial court=s determination about the adequacy of
an expert report for 
abuse of discretion.  Palacios,
46 S.W.3d at 877-78.  A trial court abuses its discretion if it
acts in an arbitrary or unreasonable manner without reference to any guiding
rules or principles.  Bowie, 79 S.W.3d at 52.  We
may not substitute our judgment for the trial court=s judgment.  Id.

The Report

With these principles in mind, we now
turn to Dr. Kirk=s expert report.  In
the   twenty-eight-page report, Kirk goes
through the nurses= notes chronologically and provides commentary regarding
deficiencies in the care rendered by Gallardo and others, including Sunset=s nurses.  The report discusses deficiencies in many
areas, including the failure to prevent or adequately treat decubitus
ulcers and the failure to prevent acute exacerbation of congestive heart
failure.








Regarding decubitus
ulcers, the report states that Gallardo had a stage II decubitus
ulcer on his right hip on and off from January to April 1999.[4]  By May 1999, the decubitus
progressed to stage IV and eventually developed into cellulitis,
requiring in-patient management with intravenous antibiotics and Asurgical debridement
with flap.@  
From May 3 to mid-June, the treatment was not changed although the wound
was clearly getting worse.  The report
further states:

On March
1, 1999, the Treatment Nurse recommended a water mattress.  The records do not reflect that Mr. Gallardo
received a water mattress or any other type of off loading mattress.  There are comments on the CDR noting that
this (right hip decubitus) is a recurring problem and
that resident favors his right side. 
However, neither Dr. Ugarte nor the Treatment
Nurse address preventative measures except for
recommending a water mattress which Mr. Gallardo did not get.  Nor did he receive any other type of off
loading mattress.  More frequent checks
by the CNA to insure he maintained a position change every two hours, padding
his bed in such a manner as to maintain him in position and Granulex
spray to pressure points are but a few of the things that . . . could have been
done to prevent as well as treat the decubitus.  There is no evidence in the record that Mr.
Gallardo received any of these preventive measures.

 

The report indicates that Sunset=s nurses did not always inform Ugarte of changes in Gallardo=s condition, including changes
related to decubitus. 
But the report also indicates that Ugarte saw
Gallardo during the period that he had the decubitus,
although it is not clear how often Ugarte saw
him.  The report states that a nurse
consulted with Ugarte regarding decubitus
on July 5.  The next day, Ugarte saw Gallardo and admitted him to the hospital for
the problem.  Ugarte=s progress notes for that day contain
his first mention of decubitus.








Regarding acute exacerbation of
congestive heart failure, the report states that the certificate of death lists
that illness as a cause of death.  The
entry in the nurses= notes for February 6,
1999--approximately six months before Gallardo=s death--states that Gallardo was hypotensive and that Ugarte
decreased his dosage of digoxin.  Kirk questions the decision to lower digoxin because it is not associated with hypotension.

The entry for February 16, 1999
states:

AResident
was getting hair cut when resident became unresponsive to painful/verbal
stimuli.@  Dr. Ugarte notified and ordered digoxin
level and decreased the frequency of Lanoxin from
once a day to once every other day. 
Again, it is not clear why the doctor is decreasing the digoxin which increases the strength of the heart
contraction.  Mr. Gallardo has congestive
heart failure and Dr. Ugarte is placing him at risk
for an acute exacerbation of heart failure by lowering the digoxin.  If the nursing assessment is accurate, Mr.
Gallardo should have been placed on oxygen and a call to 911 should precede the
call to Dr. Ugarte. 
Please note, Dr. Ugarte
does not evaluate this incident or address it in his Progress Notes.  

 

The entry for April 15, 1999 states
that Gallardo=s digoxin
level was 0.6ng/ml and that therapeutic levels are 0.8-2.0ng/ml.  Kirk criticizes Ugarte
for failing to address this laboratory report and failing Ato increase the Lanoxin
to a therapeutic level even though Mr. Gallardo has been hospitalized once this
year for an acute exacerbation of CHF.@  
There is nothing to indicate that Ugarte ever
increased the digoxin after this date.

The report concludes with the
following observations regarding Ugarte: 

Dr. Ugarte failed to meet the standard of care to accurately
assess and diagnose Mr. Gallardo, to prescribe medications consistent with Mr.
Gallardo=s diagnosises and current
prescribing standards, to prescribe an accurate dose of medication to treat the
condition for which it was prescribed, to prescribe an appropriate medication,
to provide treatment consistent with Mr. Gallardo=s diagnosises and medical conditions and to follow
established protocols and guidelines of nursing home and the State of Texas
[sic]. . . . .

 








The breach in the standards of care
by Sunset Haven Nursing Center, Dr. Adrian O. Ugarte,
MD, and [Sunset=s medical director] caused the death of Mr. Roberto
Gallardo.  

Analysis








We conclude that the report
represents a good-faith effort to provide a fair summary of Kirk=s opinions.  Regarding decubitus
ulcers, the report states that more frequent checking by the CNA to insure that
Gallardo maintained a position change every two hours, padding his bed, and
applying Granulex spray Aare but a few of the things that . .
. could have been done to prevent as well as treat the decubitus.  There is no evidence in the record that Mr.
Gallardo received any of these preventive measures.@ 
This statement explains the standard of care by listing the steps that
could have been taken and explains how the standard of care was breached by
noting that none of the steps were taken. 
Thus, the statement specifically addresses what care was expected but
not given.  See Palacios, 46 S.W.3d at 880.  The
statement addresses causation by indicating that if the proper steps had been
taken, the decubitus could have been prevented or at
least could have been prevented from progressing to stage IV.  Although the statement does not use the word Acausation,@ the words Acould have been done to prevent as
well as treat the decubitus@ adequately convey the idea that
failure to take the proper steps caused the decubitus
or caused it to get worse.  See In re
Tenet Hosps. Ltd., 116 S.W.3d 821, 826 (Tex.
App.--El Paso 2003, orig. proceeding) (stating that the words Acause@ or Acausation@ do not have to be used as long as a
substitute word, phrase, or reference is used). 
Moreover, the report indicates that Ugarte
undertook to treat Gallardo for the decubitus and
Kirk expressly faults him for not ordering the proper steps to be taken.

Regarding acute exacerbation of
congestive heart failure, the report reflects that Ugarte
lowered Gallardo=s dosage of digoxin approximately
six months before he died.  Approximately
four months before his death, Gallardo=s digoxin
level was below the therapeutic level. 
There is no indication that Ugarte ever
increased the digoxin after that date.  Kirk opines that lowered digoxin
increases the strength of the heart contraction and placed Gallardo at risk for
an acute exacerbation of heart failure. 
Kirk also states generally that Ugarte failed
to prescribe an accurate dose of medication. 
Finally, she expressly states that Ugarte=s breach of the standard of care
caused Gallardo=s death.

The report expresses the standard of
care by stating the therapeutic level of digoxin.  It explains how Ugarte
breached the standard by stating that he placed Gallardo at risk for an acute
exacerbation of congestive heart failure by lowering the digoxin
below the therapeutic level.  The care
that was expected but not given was that Ugarte would
maintain Gallardo at an adequate dosage of digoxin.  See Palacios, 46
S.W.3d at 880.  The report
addresses causation by stating that a lowered digoxin
level increases the risk of acute exacerbation of congestive heart failure,
that one of the causes of death was acute exacerbation of congestive heart
failure, and that Ugarte=s negligence caused Gallardo=s death.








In short, the report adequately
informs Ugarte of the specific conduct Appellant has
called into question and it provides an adequate basis for the court to
conclude that the claim has merit.  See
Palacios, 46 S.W.3d at 879.  Appellant=s second issue is sustained.

Conclusion

For the reasons stated herein, the
judgment of the trial court is reversed and the cause is remanded for further
proceedings consistent with this opinion.

 

SUSAN
LARSEN, Justice

June 10, 2004

 

Before Panel No. 1

Larsen, McClure, and Chew,
JJ.

 











[1]Ugarte asserts that we must affirm because Appellant only
filed a notice of appeal from the severance order, but his brief attacks the
dismissal order.  The notice of appeal
states that Appellant is appealing Athe
Order Severing Causes entered on May 22, 2003, making final the Order of
Dismissal entered on May 6, 2003 . . . .@  A notice of appeal must Astate the date of the . . . order
appealed from.@  Tex.
R. App. P. 25.1(d)(2).  We must construe the appellate rules
reasonably but liberally, so the right of appeal is not lost by creating a
requirement not absolutely necessary from the literal words of the rule.  Maxfield v. Terry, 888 S.W.2d 809, 811 (Tex. 1994).  Viewed under this standard, we believe the
notice of appeal sufficiently identifies the order being appealed.





[2]After
the trial court dismissed Appellant=s
claims against Ugarte, the Texas Legislature repealed
article 4590i and replaced it with chapter 74 of the Civil Practice and
Remedies Code.  See Act of June 2,
2003, 78th Leg., R.S., ch. 204, '' 10.01, 10.09, 2003 Tex. Gen.
Laws 847, 864, 884.  We will cite the
repealed statute because it is the version applicable to this case.





[3]Because
the issue is not before us, we express no opinion as to whether a violation of
a stay mandated by the Texas Property and Casualty Insurance Guaranty Act may
be raised for the first time on appeal.





[4]Ugarte asserts that this suit is based solely on Gallardo=s death from aspiration pneumonia and
acute exacerbation of congestive heart failure and that any information in the
report that does not relate to these two illnesses is therefore
irrelevant.  We disagree.  Appellant=s
petition expressly states that this is both a wrongful death and a survival
suit.  He requests damages for Gallardo=s pain and suffering, and he
specifically alleges that Ugarte was negligent in
failing to ensure that Gallardo received appropriate skin treatment.  Accordingly, our review is not limited to
considering the report=s
conclusions regarding pneumonia and congestive heart failure.  See generally Felan
v. Ramos, 857 S.W.2d 113, 118 (Tex. App.--Corpus Christi 1993, writ denied)
(describing the parameters of a survival action).